Robert J. King (Bar No. 302545)
robert@kingsiegel.com
Bethany H. Hill (Bar No. 326358)
bethany@kingsiegel.com
**KING & SIEGEL LLP**
724 S. Spring Street, Suite 201
Los Angeles, California 90014
tel:   (213) 465-4802
fax:  (213) 465-4803

Attorneys for Plaintiff
James Giovanni

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Giovanni James**, an individual, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1) **Retaliation in Violation of the Sarbanes-Oxley Act (18 U.S.C. § 1514A)** |
| **Red Oak Capital Holdings, LLC**, a limited liability company; **Red Oak Capital Group, LLC**, a limited liability company; **Red Oak Capital Financial, LLC**, a limited liability company; **Red Oak Capital GP, LLC**, a limited liability company; **Insperity PEO Services, L.P.**, a Delaware limited partnership; **Gary Bechtel**, an individual; and **Does 1-10**, inclusive, | 2) **Whistleblower Retaliation (Lab. Code § 1102.5)** |
| | **Demand for Jury Trial** |
| Defendants. | |

Complaint

Plaintiff James Giovanni, by and through his attorneys, hereby complains and alleges as follows:

## PARTIES

1. Plaintiff **James Giovanni** was a resident of California at all times relevant to this complaint. Mr. Giovanni began working at Red Oak Capital Financial, LLC, in February 2021 as the lead underwriter for the company's Capital Group. Mr. Giovanni served as a CRE (Commercial Real Estate) Underwriter at Red Oak's Irvine California Offices (although he primarily worked from his home in Los Angeles) until his retaliatory termination on September 3, 2021.

2. Defendant **Red Oak Capital Holdings, LLC** describes itself as "a family of commercial real estate finance and investment companies that includes Red Oak Financial, LLC, Red Oak Holdings Management, LLC, and Red Oak Capital GP, LLC" and serves as the sponsor for several Delaware LLC's that raise capital through Regulation A+ bond offerings, which allows Red Oak to solicit funds from unaccredited investors.

3. Defendant **Red Oak Capital Group, LLC** is a subsidiary of Defendant Red Oak Capital Holdings, LLC. Red Oak Capital Group is described as Mr. Giovanni's employer in his offer letter.

4. Defendant **Red Oak Financial, LLC** is a subsidiary of Defendant Red Oak Capital Holdings, LLC. Red Oak Financial is described as Mr. Giovanni's employer in his offer letter.

5. Defendant **Red Oak Capital GP, LLC** is a subsidiary of Defendant Red Oak Capital Holdings, LLC. Red Oak Capital GP, LLC, serves as the manager of each of the investment vehicles and collects significant fees for organizing and managing the investments.

6. Defendant **Insperity PEO Services, L.P.**, is a Delaware limited partnership and joint employer of Plaintiff.

7. Defendant **Gary Bechtel** is Defendant's Chief Executive Officer (CEO).

1
COMPLAINT

8. Plaintiff does not currently know the names and true identities of **Does 1-10**. Plaintiff reserves the right to amend this complaint to show their true names and capacities when this information is ascertained. Each Doe defendant is responsible for the damages alleged pursuant to each of the causes of action asserted, either through its own conduct, or vicariously through the conduct of others. All further references in this complaint to any of the named Defendants includes the fictitiously named defendants.

9. At all times alleged in the complaint, each Defendant was an agent, servant, employee, partner, joint employer, integrated enterprise, and/or joint venture of every other Defendant and was acting within the scope of that relationship with each of the other Defendants. Moreover, the conduct of every Defendant was ratified by each other Defendant.

## **VENUE AND JURISDICTION**

10. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, as well as 18 U.S.C. § 1514A, *et seq.*, which creates a private right of action for employees who experience retaliation who engage in protected activity relating to a publicly traded company.

11. Venue is proper in this district under 28 U.S.C. § 1391(a), because the acts that give rise to the complaint, as well as certain acts that violate federal securities laws or rules promulgated by the SEC, took place in this district. Mr. Giovanni lived and worked in this district. A substantial part of the events or omissions giving rise to the claim occurred in this district.

12. Mr. Giovanni filed a complaint with the United States Department of Labor ("DOL") on March 3, 2022. More than 180 days have elapsed since that complaint was filed, and no decision has been issued by the DOL to date. Mr. Giovanni therefore has exhausted his administrative remedies.

# **SECURITIES LAWS AND SEC REGULATIONS**[1]

15 U.S.C. § 78m(b)(2)(B):

"Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78*o*(d) of this title shall…devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that "transactions are executed in accordance with management's general or specific authorization; **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets…; and **(iv)** the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

17 C.F.R. § 240.13a-15(a) requires that Defendant maintain adequate "internal control over financial reporting."

---

[1] Plaintiff brings a claim for whistleblower retaliation under 18 U.S.C. § 1514A, which require Plaintiff to establish a reasonable belief that Defendant violated certain securities laws. "To allege protected activity [for a whistleblower retaliation claim], an employee 'need only show that he or she 'reasonably believes' that the conduct complained of' is a violation of the laws enumerated in 18 U.S.C. § 1514A." *Erhart v. Bofi Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017) (citing *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015) (additional citations omitted)).

Plaintiff therefore sets forth the following authorities, which Plaintiff reasonably believed were being violated. The authorities listed herein are not intended to be exhaustive of all authorities which Plaintiff could have reasonably believed were being violated. Rather, the authorities are included part of the "short and plain statement…showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8), and to give Defendants fair notice of the basis of Plaintiff's reasonable beliefs regarding securities laws violations. Plaintiff reserves his right to present additional authorities substantiating his reasonable belief as may be reasonable or necessary in the course of litigation.

17 C.F.R. § 240.13a-15(b) requires that Defendant "evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures."

## FACTS

### Background

13. In February 2021, Mr. Giovanni was hired to work at Red Oak Financial and Red Oak Capital Group as lead underwriter for the company's Capital Group.

14. Mr. Giovanni worked at the company's new office in Irvine, California, where the company's CEO, Gary Bechtel, was located. Due to COVID, he worked mostly from his home in Los Angeles County.

15. Mr. Giovanni quickly discovered serious problems with Red Oak's internal controls, the quality of the loans that it was originating, and the representations that it was making to investors. When he raised protected internal concerns, he was admonished and ultimately fired for being a whistleblower. Any alternate justification for his firing is pretext.

### Mr. Giovanni Was a Strong Performer

16. When he joined Red Oak, Mr. Giovanni met friendly colleagues who often lauded him on his work product. That changed after he started raising concerns about improper practices at Red Oak.

### Mr. Giovanni Complains About Deficient Controls

17. Red Oak made representations to its investors about the quality and quantity of the loans it was underwriting and the assets used to secure those loans. As the company's lead underwriter, Mr. Giovanni was responsible for safeguarding the company's quality control and underwriting processes, ensuring that Red Oak's representations to shareholders stayed accurate. However, Mr. Giovanni began to see that Red Oak failed to stay true to its representations, and over time, Mr. Giovanni raised numerous complaints about problems with Red Oak's internal controls.

18. For example, Mr. Giovanni discovered that Red Oak was not adequately verifying the assets and liquidity of sponsors for its loans. Red Oak promised investors in its public filings that it used "ROCX" software to assess the creditworthiness of its sponsors. The ROCX software was intended to verify accuracy of accounts listed by potential sponsors through direct access to their banking information. However, Red Oak was making numerous loans to sponsors who refused or claimed to be unable to use the system, rendering Red Oak's promise to use the software a misrepresentation (additional misrepresentations to investors regarding this system are discussed below).

19. Not only did Red Oak fail to use ROCX as it represented to investors, it also did not conduct adequate diligence or verification of potential borrowers and their financial condition outside of the software. When Mr. Giovanni attempted to verify that the bank accounts listed by potential sponsors in their voluntary disclosures existed, belonged to the sponsors, and contained the funds necessary to support the loan, he ran into significant pushback from his superiors.

20. For example, in late August 2021, Mr. Giovanni sought documentation to verify ownership of accounts listed by the sponsor to a loan that Red Oak originated in Ohio, Gary Bechtel chastised him: "we can't let it impede our ability to actually process a loan Jim." When Mr. Giovanni continued to push for verification from the borrower—who refused to used ROCX—Mr. Bechtel again chastised him, writing:

> *"It seems as if we are questioning EVERY document that borrowers are providing us and this is creating bottlenecks on getting transactions processed. We get paid for speed and creativity; we're not a bank. Unless there is a reason that we believe the borrower has provided fraudulent documents, we should be revieing them at face value and incorporating into our work product."*

21. In fact, Mr. Giovanni was concerned that potential borrowers were providing fraudulent documents. However, without the software or resources to independently verify the accuracy of the information provided by the sponsors, he had little ability to verify the documents' accuracy to prevent fraud from occurring.

22. On August 20, 2021, Mr. Giovanni again sought to mitigate risk from a sponsor who was not using ROCX to verify her banking information, asking for a letter of verification from the borrower's bank. Mr. Bechtel responded: "Jim, this is getting old." When Mr. Giovanni persisted, Mr. Bechtel wrote: "Just seems like you are overly focused on this topic to the detriment of other things."

23. Mr. Giovanni also raised numerous concerns about investors falsifying rent rolls used to evaluate the investment (with assistance from Red Oak employees), falsified documents provided by borrowers, lack of adequate Know Your Customer diligence and other failures in Red Oak's underwriting and investment processes.

24. For example, Mr. Giovanni raised numerous concerns about the accuracy of information presented to the "Investment Committee," and concerns about the pace of Red Oak's investment—which left little or no time to answer questions raised by the Investment Committee, failure to track and report loan exceptions, failure to track performance of existing loans with verified documents, and concerns about Red Oak's failure to adhere to the terms of the "Letter[s] of Intent" signed by potential sponsors.

25. Mr. Giovanni reasonably believed that the actions described in ¶¶ 18-24 constituted violations of one or more securities laws, including but not limited to 15 U.S.C. § 78m(b)(2)(B), 17 C.F.R. § 240.13a-15(a), and/or 17 C.F.R. § 240.13a-15(b).

**Mr. Giovanni's Complaints About Investor Fraud**

26. Mr. Giovanni also raised several complaints that related to misrepresentations in the Offering Circulars provided to potential bond investors and statements made to potential investors through public channels or during investment presentations.

27. First, although the Offering Circulars state that Red Oak will invest in loans collateralized by "income producing commercial properties," many of the properties underlying the Red Oak investments had significant deficiencies regarding their potential to produce income and cover the mortgage loans that Red Oak was

originating. Indeed, several of the properties that served as collateral on Red Oak loans were distressed and rescued from foreclosure by their prior lender **through the Red Oak loans**. In other words, they were not income producing properties as had been represented to investors. Mr. Giovanni raised numerous concerns about the suitability of investment in many of these properties to his supervisors and other employees.

28. Second, when Mr. Giovanni first joined Red Oak in 2021, he discovered that they had not been including liquidity analyses in their credit approval memos. After he raised concerns about this issue, Red Oak began to include the information. However, various other aspects of their underwriting procedures lacked rigor or were routinely ignored. Mr. Giovanni raised concerns about use of outdated or compromised appraisals, inflated projections, and insufficient supporting documentation as to a number of loans to his supervisors and other employees.

29. Third, the Offering Circulars state that Red Oak "do[es] not intend to originate loans to known geographic regions that have been recently hit by a natural disaster." However, on August 27, 2021, the Investment Committee approved a loan secured by a property in New Orleans called "Executive Plaza." The day before, John Bel Edwards, the governor of Louisiana, had issued a state of emergency in that exact region due to Hurricane Ida. Moreover, as the memo presented to the investment committee noted, the property was "devastated by Hurricane Katrina." Mr. Giovanni raised concerns about the property to his supervisors and other employees.

30. Fourth, although Red Oak's offering circulars state that investor funds will not be used to finance "development" projects or "raw land," in the spring and summer of 2021, Red Oak pursued financing the purchase of raw land and a development project in San Rafael California. Not only was this loan contrary to the investment disclosures, it also presented a number of material risks that rendered it a poor and risky investment. Among other issues, part of the parcel was "land-locked" with no existing street access. Nonetheless, Mr. Bechtel instructed Mr. Giovanni to falsify the investment committee memorandum to indicate that the project was

Complaint

"shovel ready" and "fully entitled." It was not. Mr. Giovanni raised concerns about the suitability of the property to his supervisors and other employees.

31. Fifth, while the investment circulars note that Red Oak intends to offer bridge loans of 12-36 months with optional extensions, Red Oak manipulated its calculation of the internal rate of return (IRR) to include interest earned on longer loans. For example, in an April 28 email, Garry Bechtel wrote that "You have to trick the model to give you the other year IRRs. If you only put in 12 months, it doesn't recognize any interest income for following year, hence the IRRs are very low." Mr. Giovanni resisted this practice and raised concerns about Red Oak's calculations to his supervisors and other employees.

32. Sixth, in July 2021, Mr. Giovanni raised concerns about forged documents submitted by a sponsor, Ali "Sam" Razjooyan, who did not use ROCX to verify his banking information. The sponsor also appeared to have significant liquidity issues. Red Oak had previously originated four other loans to Mr. Razjooyan and retained significant exposure on those loans. In July, Red Oak declined to issue the new loan, but did not exit their existing loans with him and suggested that they would do business with him in the future once he "earned" back their trust. Mr. Giovanni also raised concerns about fraud with respect to several other sponsors to whom Red Oak lent money during his employment.

33. Seventh, in August 2021, Red Oak sought to issue a loan secured by a property in New Orleans known as "Executive Plaza." The initial appraisal on the property showed that the loan would have an 80% loan to value ("LTV") ratio—higher than the maximum 75% LTV value presented to investors in the Offering Circulars. Red Oak assisted the borrower in manipulating its rent rolls to increase the appraisal and reduce the LTV. However, the true LTV of the loan exceeded Red Oak's representations to its investors. Mr. Giovanni raised concerns about the appraisal and LTV ratio to his supervisors and other employees.

34. Eighth, as already discussed, Red Oak emphasizes its use of a proprietary

software system called "ROCX" in its Offering Circulars. However, Red Oak frequently did not use the software to underwrite deals. Mr. Giovanni raised numerous concerns about this failure to his supervisors and other employees.

35. Mr. Giovanni reasonably believed that the actions described in ¶¶ 25-34 constituted violations of one or more securities laws, including but not limited to 15 U.S.C. § 78m(b)(2)(B), 17 C.F.R. § 240.13a-15(a), and/or 17 C.F.R. § 240.13a-15(b), and/or 17 CFR 240.10b-5, and/or 15 U.S.C. § 78j.

### Mr. Giovanni's Termination

36. In August 2021, CEO Gary Bechtel exhibited increasing hostility to Mr. Giovanni's efforts to adequately underwrite the loans issued by Red Oak, including telling Mr. Giovanni that his efforts were "getting old" and directing him to be less rigorous.

37. On August 27, 2021, the Investment Committee approved the loan to the "Executive Plaza," the property in a disaster zone in New Orleans, Louisiana. After the Investment Committee call, Mr. Giovanni called Joseph Elias, the company's COO, and told him that the CEO, Gary Bechtel, and the loan Originator, David Christensen, were, among other things, (i) omitting information from credit memos, (ii) that the borrower had been defaulting on loans for decades, and (iii) that the borrower was linked to fraud. Mr. Elias told Mr. Giovanni that his "side conversations" about his doubts "were not going to help [him]."

38. On September 3, Mr. Bechtel called Mr. Giovanni and told him that he was being terminated because Mr. Bechtel did not like the way that he performed his underwriting duties.

### Mr. Giovanni Files a Complaint with OSHA Under the Sarbanes-Oxley Act

39. On March 3, 2022, Mr. Giovanni, through his counsel, filed a complaint of retaliation with the DOL's Occupational Safety and Health Administration ("OSHA") as required by the Sarbanes-Oxley Act. To date, more than 180 days have elapsed since Mr. Giovanni's administrative complaint, but OSHA has not issued a

final decision. Thus, Mr. Giovanni may proceed to file this case in federal district court, and any arbitration agreement would be void. 18 U.S.C. § 1514A(b)(1); 1514A(e).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Sarbanes-Oxley Act

### 18 U.S.C. § 1514A

### (Plaintiff Against Defendants)

40. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

41. At all times relevant to this complaint, Defendants were covered entities under the Sarbanes-Oxley Act of 2002, including pursuant to 18 U.S.C. § 1514A.

42. Plaintiff was an employee of a covered entity within the meaning of Sarbanes-Oxley.

43. Plaintiff made complaints to Defendants about conduct which he reasonably believed violated the Sarbanes-Oxley Act.

44. Defendants violated the Sarbanes-Oxley Act by, without limitation, retaliating against Plaintiff for making internal complaints of illegal conduct. Defendants ultimately terminated Mr. Giovanni because of his protected internal complaints.

45. As a proximate result Defendants' conduct, Plaintiff has suffered and will continue to suffer severe financial, mental, and emotional hardship and injury including lost compensation, lost benefits, reduced possibilities for equivalent future earnings. As further direct and proximate results of Defendants' conduct, Plaintiff continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

46. Because of the conduct alleged herein, Plaintiff hired attorneys to prosecute his claims under the Sarbanes-Oxley Act. Accordingly, Plaintiff is entitled

to recover attorneys' fees and costs in addition to other damages provided by law.

47. Moreover, Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Plaintiff's rights, entitling him to punitive damages.

## SECOND CAUSE OF ACTION

### California Labor Code § 1102.5

### Whistleblower Retaliation

### (Plaintiff Against Defendants)

48. Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

49. Labor Code section 1102.5(b) makes it unlawful for an employer to retaliate against an employee because the employer believes that the employee disclosed or will disclose information "to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discovery, or correct the violation or noncompliance […] if the employee has reasonable cause to believe that the information discloses [a violation of law]."

50. Labor Code section 1102.5 also makes it unlawful for an employer to "retaliate against an employee for refusing to participate in an activity that would result in a [violation of law]." Labor Code § 1102.5(c).

51. As alleged above, Plaintiff complained about Defendants' failures with respect to its underwriting policies and procedures to numerous individuals, including but not limited to Joseph Elias, the company's COO, who had authority over Plaintiff and who had the authority to investigate, discover or correct the violations or noncompliance Plaintiff complained of. Defendant also pushed back numerous times on underwriting loans he felt would contravene the representations made to investors. Defendants believed Plaintiff would report such activities or would continue to refuse to participate in Defendants' unlawful conduct.

52. Plaintiff made complaints to Defendants about conduct which he reasonably believed violated the Sarbanes-Oxley Act.

53. Defendants retaliated against Plaintiff for his complaints, up to and including termination.

54. Plaintiffs are entitled to lost wages, back pay, front pay, and reasonable attorney's fees. Moreover, Defendants are subject to a civil penalty of $10,000 pursuant to Labor Code § 1102.5.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays judgment as follows:

A. Back pay (lost wages and benefits);

B. Injunctive Relief in the form of reinstatement with the same seniority he would have if not for the retaliation, or front pay in lieu thereof;

C. Special damages for impairment of reputation, personal humiliation, mental anguish and suffering, other noneconomic harm resulting from the retaliation, and other special damages as permitted by law;

D. Attorneys' fees and costs of suit; and

E. For such other relief as this Court deems just and proper.

Dated:     December 7, 2022          Respectfully submitted,

**KING & SIEGEL LLP**

By: *Robert J. King*
Robert J. King
Bethany H. Hill
Attorneys for Plaintiff